# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Robert E. Blackburn

Civil Case No. 24-cv-02917-REB-MDB

JAMES ERB,

    Plaintiff,

v.

PUEBLO SCHOOL DISTRICT NO. 60, Pueblo, Colorado;
R. DALTON SPROUSE in his official capacity as Director of Communications for Pueblo School District No. 60; and
JON POMPIA in his official capacity as Communications and Social Media Manager for Pueblo School District No. 60,

    Defendants.

## ORDER

**Blackburn, J.**

The matter before me is **Defendants' FRCP 12(b)(6) Motion To Dismiss** [#12],[1] filed December 19, 2024. I grant the motion as to the individual defendants (albeit not for the reasons advanced in the motion) but deny it with respect to the claim against the school district.

### I. JURISDICTION

I have jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question).

### II. STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), I must

---

[1] "[#12]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

determine whether the allegations of the complaint are sufficient to state a claim within the meaning of Fed. R. Civ. P. 8(a).  For many years, "courts followed the axiom that dismissal is only appropriate where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  **Kansas Penn Gaming, LLC v. Collins**, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting **Conley v. Gibson**, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).  Concluding that standard "has been questioned, criticized, and explained away long enough," the Supreme Court supplanted it in **Bell Atlantic Corp. v. Twombly**, 550 U.S. 544, 562, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007).

Under the standard announced in **Twombly**, the court reviews the complaint to determine whether it "'contains enough facts to state a claim to relief that is plausible on its face.'"  **Ridge at Red Hawk, L.L.C. v. Schneider**, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting **Twombly**, 127 S.Ct. at 1974).  "This pleading requirement serves two purposes:  to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense, and to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim."  **Kansas Penn Gaming**, 656 F.3d at 1215 (citation and internal quotation marks omitted).

As previously, I must accept all well-pleaded factual allegations of the complaint as true.  **McDonald v. Kinder-Morgan, Inc.**, 287 F.3d 992, 997 (10th Cir. 2002).  Contrastingly, mere "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not be sufficient to defeat a motion to dismiss.  **Ashcroft v. Iqbal**,

556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citations and internal quotation marks omitted).  **See also Robbins v. Oklahoma**, 519 F.3d 1242, 1247-48 (10th Cir. 2008) ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.") (quoting **Twombly**, 127 S.Ct. at 1974) (internal citations and footnote omitted).

Nevertheless, to meet the plausibility standard, the complaint must suggest "more than a sheer possibility that a defendant has acted unlawfully." **Iqbal**, 129 S.Ct. at 1949.  **See also Ridge at Red Hawk**, 493 F.3d at 1177 ("[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a *reasonable likelihood of mustering factual support for these claims*.") (emphases in original).  For this reason, the complaint must allege facts sufficient to "raise a right to relief above the speculative level." **Kansas Penn Gaming**, 656 F.3d at 1214 (quoting **Twombly**, 127 S.Ct. at 1965).  The standard is not met by allegations which are "so general that they encompass a wide swath of conduct, much of it innocent."  **Robbins**, 519 F.3d at 1248.  Instead "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." **Id.**

The nature and specificity of the allegations required to state a plausible claim will vary based on context and will "require[] the reviewing court to draw on its judicial experience and common sense." **Iqbal**, 129 S.Ct. at 1950; **see also Kansas Penn**

*Gaming*, 656 F.3d at 1215.  Nevertheless, the standard remains a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 127 S.Ct. at 1965) (internal quotation marks omitted).

### III.  ANALYSIS

On May 8, 2024, plaintiff James Erb read a story in the news concerning the decision of defendant Pueblo School District No. 60 ("District") to prohibit three seniors who had enlisted in the military from wearing their uniforms to graduation. (**Complaint** ¶ 2 at 1, ¶15 at 3.)  Disagreeing with that decision, Mr. Erb posted[2] on the District's Facebook page: (1) "Shame on this district for refusing 3 US Military members from wearing their uniform to graduation.  It's obvious not one person in this district has served their country, how sad": and (2) "You should do a spotlight on the three kids who graduated early, signed up to serve in the military and now want to graduate in their traditional military dress uniform, and D60 in Pueblo won't let them.  I can't wait to read that one."  (*Id.* ¶ 3 at 1-2, ¶ 15 at 3.)

Defendant Jon Pompia, a Communications and Social Media Manager for the District, allegedly became aware of these comments on the day they were posted and contacted his supervisor, R. Dalton Sprouse.  Together, they allegedly decided to

---

[2] Mr. Erb refers to these writings variously as "posts" (*see* **Complaint** ¶¶ 15 & 17 at 3), suggesting Mr. Erb himself initiated the topic, and as "comments" (*see id.* ¶ 5 at 2, ¶ 16 at 3, ¶ 21 at 4), suggesting Mr. Erb was responding to an already-existing post created by someone else.  I do not perceive the distinction to be meaningful for purposes of resolving this motion, however.

4

remove Mr. Erb's comments based on the District's official social media policy.[3]  (*Id.*, ¶¶ 16-21 at 3-4.)  Moreover, Mr. Pompia allegedly caused Mr. Erb to be banned from posting further comments on the District's Facebook page for approximately 14 days.  (*Id.* ¶ 5 at 2, ¶ 22 at 4.)  Mr. Erb brings this suit against the District and Messrs. Sprouse and Pompia in their official capacities for allegedly violating his First Amendment right of free speech.  Defendants now move to dismiss his claims against them.

Messrs. Sprouse and Pompia assert they are entitled to qualified immunity from Mr. Erb's claims.  They are not.  These defendants are sued in their official capacities only.  (*Id.* ¶¶ 13-14 at 3.)  "The defense of qualified immunity is available only in suits against officials sued in their personal capacities, not in suits against . . . officials sued in their official capacities."  **Cox v. Glanz**, 800 F.3d 1231, 1239 (10th Cir. 2015) (citation and internal quotation marks omitted).

Nevertheless, the claims against these defendants must be dismissed.   As to Mr. Erb's request for retroactive monetary relief (*see* **Complaint** ¶ 34 at 5), the Eleventh Amendment precludes federal jurisdiction over state officials acting in their official capacities, **Pennhurst State School & Hospital v. Halderman**, 465 U.S. 89, 102-03, 104 S.Ct. 900, 908-09, 79 L.Ed.2d 67 (1984).  Accordingly, these claims must be dismissed without prejudice for lack of subject matter jurisdiction.  **See Meiners v. University of Kansas**, 359 F.3d 1222, 1232 (10th Cir. 2004); **Starkey ex rel. A.B. v.**

---

[3] Despite the suggestion to the contrary (**see Complaint** ¶ 19 at 3-4), the policy is not attached to the complaint.  Nevertheless, the contents of the policy are clearly implicated by the complaint, and are partially quoted therein.  I thus may consider that document, attached to the motion, without converting the motion into one for summary judgment.  **See Gee v. Pacheco**, 627 F.3d 1178, 1186 (10th Cir. 2010) (although "[g]enerally, the sufficiency of a complaint must rest on its contents alone," court may consider, *inter alia*, "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity") (citation and internal quotation marks omitted).

*Boulder County Social Services*, 569 F.3d 1244, 1260 (10th Cir. 2009). *See also City of Chanute v. Williams Natural Gas Co.*, 31 F.3d 1041, 1045 n. 8 (10th Cir. 1994) (court has independent obligation to inquire into its own jurisdiction), *cert. denied*, 115 S.Ct. 1254 (1995); *Riggle v. LaGrand*, 2006 WL 8454658 at *1 (D. Colo. Feb. 16, 2006) ("[A] federal court is obliged to notice on its own motion the want of its own jurisdiction.") (citing 13 C.A. Wright, A. Miller & E. Cooper, FED. PRACTICE AND PROCEDURE § 3522 at 69-70 (2nd ed. 1984)), *adopted*, 2006 WL 8454657 (D. Colo. Aug. 9, 2006).

To the extent Mr. Erb intends to seek injunctive relief (*see* **Complaint** ¶ 36 at 5 (requesting "such other and further relief as the Court deems equitable, just, and proper in the circumstances")), the claims against the individual defendants in their official capacities are duplicative of the claim against the District, *see Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361-62, 116 L.Ed.2d 301 (1991) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. Suits against state officials in their official capacity therefore should be treated as suits against the State.") (citations and internal quotations marks omitted). Any such claims therefore will be dismissed on that basis. *See Rooker v. Ouray County*, 841 F.Supp.2d 1212, 1216 (D. Colo.) (dismissing redundant official-capacity claims), *aff'd*, 504 Fed. Appx. 734 (10th Cir. 2012).

For its part, the District maintains Mr. Erb's claim against it must be dismissed because the District's Facebook page is a limited public forum in which the purportedly viewpoint-neutral decision to delete Mr. Erb's posts and temporarily bar him from

posting and/or commenting further were within the guidelines of the social media policy and therefore permissible. I cannot agree, and therefore deny the motion to dismiss Mr. Erb's claim against the District.

The Tenth Circuit extensively examined the precepts and precedents which guide the court's resolution of this claim in **Summum v. Callaghan**, 130 F.3d 906 (10th Cir. 1997). As expatiated in **Summum**, the propriety of regulations on speech otherwise protected by the First Amendment depends on the context in which the speech occurs.[4] In this regard, "the Supreme Court has recognized three distinct categories of government property: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora." **Summum**, 130 F.3d at 914 (citing **Perry Education Association v. Perry Local Educators' Association**, 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-56, 74 L.Ed.2d 794 (1983)). Mr. Erb alleges the District's Facebook page is an "open public forum. " (**Complaint** ¶ 5 at 2, ¶ 27 at 4.) Although this terminology does not correspond directly to any of the recognized categories, Mr. Erb describes the District's Facebook page as one which "allows for public speech – 'comments or posts' of any nature." (*Id.* ¶ 25 at 4.) I thus take him to allege the District's Facebook page is either a traditional public forum or a designated public forum.

A traditional public forum includes "places such as streets and parks, which have immemorially been held in trust for the use of the public, and, time out of mind, have

---

[4] The First Amendment applies to state government actors through the aegis of the Fourteenth Amendment. **See Schneider v. State**, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939); **Brown v. City of Tulsa**, 124 F.4th 1251, 1266 (10th Cir. 2025). In addition, the Tenth Circuit has recognized that the principles developed to assess government regulation of speech in physical fora also apply to "metaphysical" fora such as Facebook. **See Swanson v. Griffin**, 2022 WL 570079 at *3 (10th Cir. Feb. 25, 2022) ('[T]he First Amendment protects against viewpoint discrimination by the government in government-created public forums on social media."), **cert. denied**, 143 S.Ct. 100 (2022).

been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions:"

> In a traditional public forum, content-based regulations are subject to heightened scrutiny, i.e., the government must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Content-neutral regulations must be narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

**Summum**, 130 F.3s at 914 n.11 (internal citations and quotation marks omitted). A designated public forum is one that, while not a traditional public form, "the government has opened for expressive activity, treating the property as if it were a traditional public forum." *Id.* at 914. Although the forum "may be created for a limited purpose for use by certain speakers, or for the discussion of certain subjects," the government need not keep a designated public forum open indefinitely. *Id.* (citation and internal quotation marks omitted). However, as long as the forum is open, "the government is bound by the same standards as apply in a traditional public forum." *Id.* (citation and internal quotation marks omitted).

Mr. Erb presents neither argument nor authority to suggest the District's Facebook page is a traditional public forum, and it is not clear it is. **See United States v. American Library Association, Inc.**, 539 U.S. 194, 205-06, 123 S.Ct. 2297, 2304-05, 156 L.Ed.2d 221 (2003) (noting that internet access at public library has not "immemorially been held in trust for the use of the public and, time out of mind" and concluding "[t]he doctrines surrounding traditional public forums may not be extended to situations where such history is lacking"). **But compare Packingham v. North**

*Carolina*, 582 U.S. 98, 106-08, 137 S.Ct. 1730, 1736-7, 198 L.Ed.2d 273 (2017) (comparing Facebook and other social media sites to a traditional public forum in the context of a complete ban on certain categories of users having access to a government site).[5] More importantly, the allegations of the complaint and the content of the District's social media policy affirmatively contradict that characterization. Indeed, the complaint expressly refers to and quotes the District's social media policy as permitting the District to

> restrict or delete comments or posts that are: Not topically related to the District's posts [e]xpressed in a manner that is not suitable for a K-12 audience or inconsistent with the District's educational mission of promoting and modeling respectful civic discourse for all our students."

(*See id.* ¶ 19 at 3-4; *see also* **Motion App.**, Exh. A.) Given these restrictions, the question thus becomes whether the District's Facebook page is a designated public forum or a limited public forum.[6]

---

[5] The Sixth Circuit found **Packingham** did not stand for the proposition that a government entity's Facebook page is per se a traditional public forum, at least where a speaker is not banned entirely from posting. **Cooper-Keel v. Michigan**, 2024 WL 3440019 at *2 (6th Cir. April 9, 2024), *cert. denied*, 2024 WL 4486509 (Oct. 15, 2024). Other courts also have declined to conclude that government entities' Facebook pages are traditional public fora, relying on the above-quoted language from **American Library Association**. *See e.g.*, **Leighty v. Spokane County**, 2024 WL 3432364 at *8 (E.D. Wash. July 16, 2024) (refusing to consider Facebook a traditional public forum); **Price v. City of New York**, 2018 WL 3117507 at *15 (S.D.N.Y. June 25, 2018) (court "would be inclined to find that the City's official Twitter accounts do not constitute a traditional public forum," but finding it unnecessary to resolve the issue at that juncture). Moreover, courts have rejected the notion that privately owned social media platforms are public fora. *See, e.g.*, **Federal Agency of News LLC v. Facebook, Inc.**, 432 F.Supp.3d 1107, 1122 (N.D. Cal. 2020); **Langdon v. Google, Inc.**, 474 F.Supp.2d 622, 632 (D. Del. 2007).

[6] A limited public forum is a type of nonpublic forum – that is, "[p]ublic property which is not by tradition or designation a forum for public communication," **Summum**, 130 F.3d at 916 (citation and internal quotation marks omitted; alteration in original) – which the government opens to speech while "reserv[ing] the forum for the specific official uses to which it is lawfully dedicated," *id.* "When the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum, it creates a limited public forum." *Id.* (internal quotation marks omitted). Regulations impacting speech in a limited public forum are subject to review only for reasonableness: "[t]hus, [c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of

Although these two terms "are not interchangeable," the distinction between them admittedly "is far from clear."  **Summum**, 130 F.3d at 916 n.14.  In making this determination, a critical consideration is the government's intent in creating the forum, which requires the court to examine "the policy and practice of the government" as well as "the nature of the property and its compatibility with expressive activity."  **Cornelius v. NAACP Legal Defense & Education Fund, Inc.**, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985).  **See also Summum**, 130 F.3d at 915 ("In determining whether the government has created a designated public forum, courts must examine several factors, including (1) the purpose of the forum; (2) the extent of use of the forum; and (3) the government's intent in creating a designated public forum.").  Because these determinations are fact-specific, a government-sponsored Facebook page may be either a designated public forum or a limited public forum depending on the purpose for which it was created and the way in which it is used.  **See Davison v. Randall**, 912 F.3d 666, 682-87 (4th Cir. 2019) (concluding interactive component of Facebook page of chair of county board of commissioners was public forum),[7] **as amended** (Jan. 9, 2019).

Ultimately, the court need not determine this question at this juncture because

---

the purpose served by the forum and are viewpoint neutral."  **Id.** (citation and internal quotation marks omitted; second alteration in original).  **See also Schmidt v. Siedel**, 717 F.Supp.3d 1147, 1158 (D. Wyo. 2023) (government may engage in content discrimination in limited public forum).  Nevertheless, if the government opens "a limited forum, . . . [it] must respect the lawful boundaries it has itself set."  **Rosenberger v. Rector & Visitors of University of Virginia**, 515 U.S. 819, 829, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995).

[7]  Ultimately, however, the court in **Davison** elided the question of what *type* of public forum was created thereby since the defendant's action in banning the plaintiff amounted to viewpoint discrimination, "which is prohibited in all forums."  **Davison**, 912 F.3d at 687 (citation and internal quotation marks omitted).

10

under either rubric, the District cannot engage in viewpoint discrimination.  Viewpoint discrimination is "a subset of and an egregious form of content discrimination," which carries a "heavy presumption of impermissibility" and is reviewed under the same strict scrutiny standards applicable to speech restrictions in traditional public fora.  ***Summum***, 130 F.3d at 917 (citations and internal quotation marks omitted).  The government cannot engage in viewpoint discrimination in any forum, even one over which it legitimately may regulate the content of speech.  ***Rosenberger v. Rector and Visitors of University of Virginia***, 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

Mr. Erb's complaint plausibly alleges the District deleted his posts and temporarily banned him from further comment based on his viewpoint, that is, his disagreement with the District's decision regarding graduation.[8]  (**See Complaint** ¶ 31 at 5.)   A government entity may not exclude speech merely because it criticizes government actors or actions.  ***See Rosenberger***, 115 S.Ct. at 2516 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); ***Perry***

---

[8]  Mr. Erb argues that the ban imposed on him by the District constitutes a prior restraint on speech.  It does not.  "[O]ur decisions have steadfastly preserved the distinction between prior restraints and subsequent punishments. . . . [W]e think [this distinction] is critical to our First Amendment jurisprudence." ***Alexander v. United States***, 509 U.S. 544, 553-54, 113 S.Ct. 2766, 2773, 125 L.Ed.2d 441 (1993).  "[U]nlike an adverse action taken in response to actual speech, [a prior restraint] chills potential speech before it happens." ***Brammer-Hoelter v. Twin Peaks Charter Academy***, 492 F.3d 1192, 1209 (10th Cir. 2007) (citation and internal quotation marks omitted; alteration in original).  As Mr. Erb was not barred from posting his comments initially, the temporary ban imposed after he posted his comments is not a prior restraint.

***Education Association***, 103 S. Ct. at 955 (government may regulate content of limited purpose forum so long as restrictions imposed are "not an effort to suppress expression merely because public officials oppose the speaker's view"); ***Taylor v. Roswell Independent School District***, 713 F.3d 25, 51 (10th Cir. 2013) (government officials are "not at liberty to suppress or punish speech simply because they disagree with it, or because it takes a political or social viewpoint different from" their own) (citation and internal quotation marks omitted); ***Mesa v. White***, 197 F.3d 1041, 1046 n.4 (10th Cir. 1999) (viewpoint discrimination "goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the particular position the speaker wishes to express") (citation and internal quotation marks omitted).

Moreover, the District's Social Media Policy plausibly can be read to *allow* viewpoint discrimination. A provision of the policy (which the District fails to mention in its motion) allows it to remove

> [a]ny comments expressed on District social media sites in response to District content, including but not limited to photos, graphics, links and content on other linked internet sites, [that] do not reflect the opinions, positions or endorsements of the District, its directors, or staff.

(**Motion App.**, Exh. A.) This aspect of the policy raises the specter of viewpoint discrimination – posts or comments which disagree with the District's "opinions, positions, or endorsements" may be removed. Mr. Erb plausibly has alleged that his comments were removed, and his access temporarily blocked, because he disagreed with the District's decision not to allow students to wear their military uniforms at graduation. Such a decision would violate his First Amendment rights unless the

District could show either that it was not motivated by Mr. Erb's disagreement with its decision and/or that its policy is narrowly tailored to advance a compelling government interest.  *Summum*, 130 F.3d at 917; *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1279-80 (10th Cir.), *cert. denied*, 117 S.Ct. 360 (1996).  Because the allegations of the complaint plausibly allege such a violation, the motion to dismiss Mr. Erb's claim against the District must be denied.

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Defendants' FRCP 12(b)(6) Motion To Dismiss** [#12], filed December 19, 2024, is granted in part and denied in part;

2.  That Mr. Erb's claims against Dalton Sprouse and Jon Pompia in their official capacities for monetary damages and retrospective relief are dismissed for lack of subject matter jurisdiction, and otherwise are dismissed as duplicative of his claims against Pueblo School District No. 60;

3.  That at the time judgment enters, judgment without prejudice shall enter on behalf of defendants R. Dalton Sprouse, in his official capacity as Director of Communications for Pueblo School District No. 60, and Jon Pompia, in his official capacity as Communications and Social Media Manager for Pueblo School District No. 60, and against plaintiff, James Erb, as to all claims for relief and causes of action against them; and

4.  That in all other respects, the motion is denied.

Dated February 14, 2025, at Denver, Colorado.

**BY THE COURT:**

*Bob Blackburn*
Robert E. Blackburn
United States District Judge

14